E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
DECLAN T. CONROY (Cal. Bar No. 350570)
CAMERON C. VANDERWALL (Cal. Bar No. 322680)
Assistant United States Attorneys
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0647
    Facsimile: (213) 894-0141
    E-mail:   declan.conroy@usdoj.gov
            cameron.vanderwall@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:23-cr-00636-FLA |
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM |
| v. | Trial Date: May 7, 2024 |
| | Trial Time: 8:30 AM |
| BENJAMIN MENSAH, | Location:  Courtroom of the |
| Defendant. | Hon. Fernando L. |
| | Aenlle-Rocha |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Declan T. Conroy and Cameron C. Vanderwall, hereby files its Trial Memorandum in the above-captioned matter.

This Trial Memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.  The parties conducted a telephonic meet-and-confer on April 25, 2024, and

discussed the requisite issues herein in accordance with the Court's
Criminal Standing Order.  The government respectfully reserves the
right to supplement and/or modify this memorandum as may be
appropriate.

Dated: April 26, 2024                Respectfully submitted,

                                     E. MARTIN ESTRADA
                                     United States Attorney

                                     MACK E. JENKINS
                                     Assistant United States Attorney
                                     Chief, Criminal Division


                                     /s/ Declan T. Conroy
                                     DECLAN T. CONROY
                                     CAMERON C. VANDERWALL
                                     Assistant United States Attorneys

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION

3
4
5
6
7
8
9
10
11
12
13
14

The government intends to prove beyond a reasonable doubt that defendant Benjamin Mensah ("defendant") conspired to distribute methamphetamine in violation of 21 U.S.C. § 846 and attempted to export methamphetamine in violation of 21 U.S.C. §§ 953(c), 963, and 960(a)(1), (b)(1)(H).  On March 5, 2024 this Court held a first trial in this case.  After deliberating for three days, the jury was unable to reach a unanimous verdict and the Court declared a mistrial.  The re-trial is scheduled to begin on May 7, 2024, and is estimated to last approximately four days.  This memorandum is intended to provide the Court with an overview of the government's witnesses and evidence, and to outline legal and evidentiary issues that may arise at trial.

15

### II.   STATUS OF THE CASE

16

#### A.   Indictment

17
18
19
20
21
22
23

On December 19, 2023, a federal grand jury returned an indictment charging defendant with conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846 and attempted exportation of methamphetamine in violation of 21 U.S.C. §§ 953(c), 963, and 960(a)(1), (b)(1)(H).  (Dkt. 12.)  The conspiracy began on an "unknown date" -- but no later than on or about October 1, 2022 -- and continued until on or about October 26, 2023.  (Id. at 1-2.)

24

#### B.   Discovery

25
26
27
28

The government has produced more than 3,400 pages of discovery to defendant, including transcripts, reports, images, records of communications, emails, text messages, certain Jencks Act materials for the government's anticipated witnesses, as well as numerous

videos and other multimedia files.  As of the date of this Trial Memorandum, defendant has made one discovery production comprising thirty-six pages of correspondence documents and cannabis transportation manifests.

####     C.    Trial Time Estimate

A jury trial in this matter is scheduled to begin on May 7, 2024 at 8:30 a.m.  The government anticipates that its case-in-chief, including cross-examination, will last approximately two days. Defendant has not provided notice of any defense.

Pursuant to the Court's Criminal Standing Order, the parties met and conferred on April 25, 2024 regarding the time estimate for the government's case-in-chief.  During that meet and confer, defendant represented that he expects his cross-examination of the government's witnesses to add an additional day to the case, and further expects that the defense case will last approximately one day.

####     D.    Defendant

Defendant is in custody pending trial.  Defendant was ordered detained on December 13, 2023 by Magistrate Judge Jacqueline Choolijan based on a risk of nonappearance and danger.  (See Dkt. 10.)  Defendant subsequently moved for bond reconsideration, which this Court denied on January 30, 2024.  (See Dkt. 30.)  Following the previous trial, the defendant again moved for bond reconsideration, which this Court denied again on March 12, 2024.  (See Dkt. 86.)

**E.   Government Witnesses and Exhibits**

The government presently intends to call the following witnesses in this order[1]:

1. Chief Andrew Chavez, U.S. Customs & Border Protection
2. Rachel Wheale, Chemist, U.S. Customs & Border Protection
3. Brittany Juarez, Security Manager, DHL
4. Paula Lipp, Account Manager, Preferred Shipping Inc.
5. Collin Murphy, Special Agent, Homeland Security Investigations
6. Ryan Ribner, Supervisory Special Agent, Homeland Security Investigations
7. John Segelhurst, U.S. Customs & Border Protection
8. Christopher Long, CEO, Las Vegas Crating & Logistics Inc.
9. Dale Price, Detective Inspector, South East Regional Organised Crime Unit
10. Steve Paris, Special Agent, Drug Enforcement Administration

The defendant has informed the government that he intends to call defense witnesses.

**F.   Stipulations**

The parties have not agreed to any stipulations at this time.

**G.   Pending Motions**

The government has filed two motions <u>in limine</u>:  one to admit certain evidence under Federal Rule of Evidence 404(b) (<u>see</u> Dkt. 103), and another to preclude defendant from reference or arguing facts not admitted as evidence (<u>see</u> Dkt. 104).  Defendant has

---

[1] The government reserves its right not to call any of the witnesses on this list, to call additional witnesses, and/or to re-arrange the order in which it calls these witnesses.

indicated he intends to orally oppose the motion in limine regarding Rule 404(b) evidence, and that he does not oppose the motion in limine regarding facts not admitted as evidence.

**III. THE CHARGED OFFENSES**

    **A.    Conspiracy to Distribute Methamphetamine:  21 U.S.C. § 846 (Count 1)**

The government alleges in Count One that beginning on or about October 1, 2022, and continuing until on or about October 26, 2023, in Los Angeles County, within the Central District of California, the defendant, together with his co-conspirators, conspired and agreed with each other to knowingly and intentionally distribute methamphetamine in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A).

For defendant to be found guilty of that offense, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on or about October 1, 2022 and ending on or about October 22, 2023, there was an agreement between two or more persons to distribute methamphetamine; and

Second, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.
See Ninth Circuit Model Criminal Jury Instructions, No. 12.5 (2022 ed.) [Conspiracy -- Elements].

    1.   Definitions

As the Model Criminal Jury Instruction explains:

"To distribute" means to deliver or transfer possession of methamphetamine to another person, with or without any financial interest in that transaction.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The

6

crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object or purpose of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

See Ninth Circuit Model Criminal Jury Instructions, No. 12.5 (2022 ed.) [Controlled Substance—Conspiracy to Distribute or Manufacture (21 U.S.C. §§ 841(a), 846)].

      2.   Quantity

For defendant to be subject to the applicable statutory maximum and statutory minimum penalties, the government must prove beyond a reasonable doubt that the amount of methamphetamine defendant intended to distribute equaled or exceeded 50 grams or more of methamphetamine.  The government does not need to prove that defendant knew the quantity of the methamphetamine.

**B.    Attempted Exportation of Methamphetamine:  21 U.S.C. §§ 953(c), 963, 960 (a)(1),(b)(1)(H) (Count 2)**

The government alleges in Count Two that on or about February 28, 2023, in Los Angeles County, within the Central District of California, the defendant knowingly and intentionally attempted to export from the United States at least 500 grams of methamphetamine in violation of Title 21, United States Code, Sections 953(c), 963, and 960(a)(1),(b)(1)(H).

For defendant to be found guilty of that offense, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant intended to send a mixture of substance containing a detectable amount of methamphetamine from the United States to a place outside the United States;

Second, the defendant knew the substance was a mixture of substance containing a detectable amount of methamphetamine or some other prohibited drug; and

Third, the defendant did something that was a substantial step toward exporting the mixture of substance containing a detectable amount of methamphetamine.

See Ninth Circuit Model Jury Instructions, Nos 4.4 and 12.19 (2022 ed.) [Attempt & Unlawful Importation] (modified for exportation).

### 1.   Definitions

A "substantial step" is conduct that strongly corroborated a defendant's intent to commit the crime.  To constitute a substantial step, a defendant's act or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.  Mere preparation is not a substantial step toward committing the crime.

1       Jurors do not need to agree unanimously as to which particular

2   act or actions constituted a substantial step toward the commission

3   of a crime.

4       It does not matter whether the defendant knew that the substance

5   was methamphetamine.  It is sufficient that the defendant knew that

6   it was some kind of a prohibited drug.

7   Ninth Circuit Model Jury Instructions, Nos 4.4 and 12.19 (2022 ed.)

8   [Attempt & Unlawful Importation] (modified for exportation)

9          2.   Quantity

10      For defendant to be subject to the applicable statutory maximum

11  and statutory minimum penalties, the government must prove beyond a

12  reasonable doubt that the amount of the mixture of substance

13  containing a detectable amount of methamphetamine defendant attempted

14  to export equaled or exceeded 500 grams or more.  The government does

15  not need to prove that defendant knew the quantity of the substance.

16                  *   *   *   *   *

17      Pursuant to the Court's Criminal Standing Order, the parties met

18  and conferred on February 15, 2024 regarding the government's

19  statement of the charges and elements of each charge.  Based on that

20  meet and confer, the government understands that defendant objects to

21  the language in the second element of the attempted exportation of

22  methamphetamine charge that reads "or some other prohibited drug."

23  The government understands that defendant objects to this language

24  because, in his view, it is inconsistent with the rest of the charge,

25  and because the indictment specifically charges defendant with

26  exporting methamphetamine.

27

28

**IV.   STATEMENT OF FACTS**

As noted above, the government intends to prove beyond a reasonable doubt that defendant conspired with at least one other individual to distribute methamphetamine in violation of 21 U.S.C. § 846, and that he attempted to export methamphetamine in violation of 21 U.S.C. §§ 953(c), 963, 960 (a)(1),(b)(1)(H).  The government expects that the evidence in its case-in-chief will establish the following facts, among others:

On March 3, 2023, CBP officers placed an enforcement exam hold on a cargo shipment with Airway Bill number 244-82819855 (the "March 5 Drug Shipment").  The exam hold was placed due to previous seizures of international shipments going to New Zealand that were manifested as car parts, as well as the shipper being a historically low-volume exporter.  The March 5 Drug Shipment was declared as "Ford Puma Starters" (that is, car parts) and originated from shipper "Maxum International Group, LLC / Gary Mopson" with an address in Atlanta, Georgia.  The receiver was listed as "Power Tyres and Mechanics Limited" with an address in Onehunga, New Zealand.

On March 5, 2023, CBP officers and a Canine Enforcement Officer responded to the Turkish Airlines warehouse at LAX -- where the March 5 Drug Shipment was being held pending inspection -- to examine the March 5 Drug Shipment.  The March 5 Drug Shipment consisted of one wooden crate containing four smaller wooden crates.  A narcotic-detecting K9 conducted a "sniff" of the exterior of the March 5 Drug Shipment and alerted to the odor of drugs.

Following the alert, CBP officers conducted a further examination of the March 5 Drug Shipment, at which time they found a false bottom concealed under automotive parts.  Inside the false

bottom, LAX CBP officers found multiple vacuum-sealed bags containing a white crystalline substance.  During initial testing, the white crystalline substance yielded presumptively positive results for properties of methamphetamine hydrocholoride, a Schedule II controlled substance.  The CBP officers located a total of twenty vacuum-sealed bags containing the presumptive methamphetamine within the concealed compartments of the March 5 Drug Shipment.  The CBP officers subsequently determined the total weight of the vacuum-sealed bags containing the presumptive methamphetamine was approximately 264.5 kilograms.  The CBP officers then seized the March 5 Drug Shipment and the presumptive methamphetamine.

After the seizure, CBP submitted a sample kilogram of the presumptive methamphetamine from the March 5 Drug Shipment to the CBP's Los Angeles Laboratory in Long Beach, California.  The one-kilogram sample tested positive for methamphetamine, with a purity of approximately 100%.

On March 15, 2023, New Zealand authorities conducted a controlled delivery of the March 5 Drug Shipment and the Mock Shipment to their intended destination, Power Tyres and Mechanics Limited ("Power Tyres") in Onehunga, Auckland, New Zealand.  The New Zealand authorities had seized an earlier, parallel shipment on February 17, 2023 that was also destined for Power Tyres, listed the same sender information, was also declared as automotive parts, and also contained false bottoms.

As a result of the controlled delivery of the March 5 Drug Shipment, New Zealand authorities arrested seven individuals connected to Power Tyres and to shipments being received at that address.  Each of the seven individuals arrested in connection with

the March 5 Drug Shipment and Mock Shipment were found to either be members of, or have close associations with, the "Killer Beez" criminal organization, a violent motorcycle gang founded in New Zealand.  The arrested individuals included three known leaders of the gang, a DHL employee, and the manager of Power Tyres.

HSI agents learned from DHL that DHL had picked up the March 5 Drug Shipment from an address in Los Angeles, California, and that the IP address 76.176.190.216 (the ".216 IP Address") had been used to create the March 5 Drug Shipment online.  DHL further disclosed that the March 5 Drug Shipment had been created using the services of Preferred Shipping Incorporated ("Preferred Shipping"), an authorized reseller of DHL services.

Through an employee at Preferred Shipping, HSI agents learned that that same IP address, the .216 IP Address, had been used to track the March 5 Drug Shipment.  And Charter Communications subsequently confirmed in response to a subpoena that defendant was the listed subscriber for the .216 IP Address both at the time it was used to track the March 5 Drug Shipment, and when it was used to repeatedly access the Preferred Shipping website.  Charter further revealed that the service address for the .216 IP Address was an address on Jumilla Avenue in Woodland Hills, California (the "Jumilla Avenue Residence"), which was defendant's home address at that time.

HSI separately identified that the shipping label for the March 5 Drug Shipment listed the contact email address for the sender of the March 5 Drug Shipment as presentprophet@gmail.com (the "Present Prophet Gmail Account"), and that that same email account was listed in the account information for the account used to create the March 5 Drug Shipment.  The account information also contained a number that

the government later identified as defendant's number based on T-Mobile subscriber records and its independent investigation of that number.  The shipping label, in turn, listed a separate phone number that T-Mobile subscriber records revealed belonged to D.J., Co-Conspirator 2 in the indictment.

After obtaining a federal search warrant for the Present Prophet Gmail Account, agents learned that that email account had been used to communicate with DHL customer service representatives in the period immediately before and immediately after the shipment of the March 5 Drug Shipment.  Agents also learned that the email account had been used to communicate with Preferred Shipping employees throughout January and February of 2023 to facilitate the March 5 Drug Shipment, and to communicate with a crating company in approximately February 2023.

In these communications, the user of the Present Prophet Gmail Account identified himself as "Gary Mopson."  However, separate emails from that time reflect that the user identified himself as "Benjamin Mensah."  And with records provided by Google, investigators learned that, as of April 17, 2023, the listed birthday for the account holder of the Present Prophet Gmail Account was December 19, 1972, which is the same date as defendant's birthday.  Records obtained from Google related to the Present Prophet Gmail Account reflected that, on August 11, 2023, the name associated with the account had been changed from "Maxum Intl Group Gary" to "B Mensah."  Additional information provided by Google revealed that the .216 IP Address was used to log in to the Present Prophet Gmail Account on approximately five occasions between February and April of 2023.

On October 24, 2023, federal law enforcement officers executed a federal search warrant at the Jumilla Avenue Residence.  During that search, law enforcement officers seized a DHL shipping label with the sender listed as "Jackson Mensah Holdings Incorporated," and which listed the receiver as Power Tyres and Mechanics Limited in Onehunga, Auckland, New Zealand.  According to the label, the shipping date for this shipment was October 7, 2022, and the declared value as $7,759 United States dollars ("USD").  A Statement of Information for Jackson Mensah Holdings filed with the California Secretary of State in 2019 lists defendant and D.J., Co-Conspirator 2, as officers of Jackson Mensah Holdings Incorporated.

A search of a cellphone seized from defendant's person at the time of his arrest revealed communications with other co-conspirators regarding the March 5 Drug Shipment -- including those communications set forth as overt acts in the indictment -- as well as voicemails from Preferred Shipping regarding the March 5 Drug Shipment.  That search also revealed communications with a co-conspirator regarding a later shipment of suspected narcotics to Australia, including those communications set forth as overt acts in the indictment.  And finally, the search of defendant's phone revealed a March 20, 2023 video of a large wooden shipping crate, consistent with the March 5 Drug Shipment, being loaded from the garage in front of the Jumilla Avenue Residence onto a large, flat-bed shipping truck, and a July 27, 2023 photo of three Ziplock bags containing substances that appear consistent with methamphetamine.

Additionally, during the same general timeframe -- between August and December of 2022 -- defendant and D.J., Co-Conspirator 2, also coordinated various shipments of marijuana to the United

Kingdom, six of which were seized by border authorities in the United Kingdom.  The seized shipments collectively weighed approximately 450 kilograms, or 990 pounds, were all sent by Jackson Mensah Holdings and, like the shipments to New Zealand, were all mis-manifested.

To facilitate certain of these falsely manifested shipments of marijuana to the United Kingdom, in August and September of 2022, defendant and D.J. relied on the services of two related Las Vegas shipping and crating companies, Las Vegas Pack and Ship and Long's Crating.  The first shipment of marijuana, which was dropped off by defendant's associate Qiana Williams on August 15, 2022, consisted of three barrels that were mis-manifested as music equipment.  After the United Kingdom seized the shipment, defendant called the CEO of Las Vegas Pack and Ship, C.L., multiple times regarding the status of the shipment.  After these calls, defendant drove to the shipping store and spoke with C.L.  Among other things, defendant demanded updates on the status of the shipment, and admitted to C.L. that the UK shipment did not contain musical instruments, but, in his words, contained "CBD".[2]  Defendant then continued to call C.L. after his visit to demand updates and a refund, which ultimately led C.L. to issue a refund directly to defendant through Cash App.

A few weeks later, D.J. visited Long's Crating, a shipping and crating company also owned and operated by C.L., to facilitate another shipment to the United Kingdom which he claimed contained potting soil.  D.J. requested $16,000 worth of insurance for the shipment, and insisted on having the shipment of "potting soil"

---

[2] During the encounter, defendant also showed C.L. photographs of dismembered body parts on his phone in an apparent effort to intimidate C.L.  The government is not seeking to admit evidence related to those photographs or defendant's threats at this time.

15

crated in front of him.  According to C.L., after this shipment got detained in customs, defendant called C.L. regarding this shipment. On this call, defendant proposed that he and C.L. enter a partnership regarding future related shipments.

\*   \*   \*   \*   \*

Pursuant to the Court's Criminal Standing Order, the parties met and conferred on April 25, 2024 regarding the government's statement of facts.  Based on that meet and confer, the government understands that defendant maintains a blanket objection to the government's statement of facts.

**V.   ANTICIPATED LEGAL AND EVIDENTIARY ISSUES**

In addition to the issues set forth in the government's two pending motions in limine (see Dkt. 104, 105), trial in this case may raise the following legal and evidentiary issues:

**A.   Law Related to Conspiracy**

**1.   Participation in the Conspiracy**

The government must show that a conspiracy between at least two people existed and that the defendant was a member of the charged conspiracy.  See, e.g., United States v. Reese, 775 F.2d 1066, 1071 (9th Cir. 1985).  "The government does not have to present direct evidence.  Circumstantial evidence and the inferences drawn from that evidence will sustain a conspiracy conviction."  United States v. Castro, 972 F.2d 1107, 1110 (9th Cir. 1992) (emphasis in original). Once a conspiracy is established only "slight evidence" is needed to connect defendant or a co-conspirator to it.  United States v. Stauffer, 922 F.2d 508, 514-515 (9th Cir. 1990); United States v. Crespo De Llano, 838 F.2d 1006, 1017 (9th Cir. 1987); United States v. Fleishman, 684 F.2d 1329, 1338 (9th Cir. 1982); United States v.

1   Dixon, 562 F.2d 1138, 1141 (9th Cir. 1977).  A defendant need not

2   participate in all phases of a conspiracy to be part of a single

3   conspiracy.  See, e.g., United States v. Burreson, 643 F.2d 1344,

4   1348 (9th Cir. 1981).  Moreover, every member of a conspiracy need

5   not know every other member, nor be aware of all acts committed in

6   furtherance of the conspiracy.  See, e.g., United States v. Taren-

7   Palma, 997 F.2d 525, 530 (9th Cir. 1993).  When a defendant is

8   charged with conspiracy, evidence tending to show the existence of a

9   conspiracy is admissible even though such evidence does not implicate

10  the defendant as the defendant's conviction is conditioned upon proof

11  of the conspiracy.  United States v. Vega-Limon, 548 F.2d 1390, 1391

12  (9th Cir. 1977).  A conspiracy is presumed to continue until there is

13  affirmative evidence of abandonment, withdrawal, disavowal, or defeat

14  of the purposes of the conspiracy.  United States v. Bloch, 696 F.2d

15  at 1215; United States v. Krasn, 614 F.2d 1229, 1236 (9th Cir. 1980).

16          2.   Co-conspirator Declarations

17       The government will offer several statements by co-conspirators,

18  including statements made by co-conspirators to the defendant

19  regarding the March 5 Drug Shipment and the sale of methamphetamine

20  and cocaine to a drug customer in Australia in May 2023.

21       Declarations by one co-conspirator during the course of and in

22  furtherance of the conspiracy may be used against another conspirator

23  because such declarations are not hearsay.  See Fed. R. Evid.

24  801(d)(2)(E).  Further, statements made in furtherance of a

25  conspiracy were expressly held by the Supreme Court in Crawford v.

26  Washington, 541 U.S. 36, 56 (2004) to be "not testimonial" such that

27  their admission does not violate the Confrontation Clause.  As such,

28  the admission of co-conspirator statements pursuant to Federal Rule

of Evidence 801(d)(2)(E) requires only a foundation that: (1) the declaration was made during the life of the conspiracy; (2) was made in furtherance of the conspiracy; and (3) there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the conspiracy and of the defendant's connection to it.  See Bourjaily v. United States, 483 U.S. 171, 173, 181 (1987).  The government must prove by a preponderance of the evidence that a statement is a co-conspirator declaration in order for the statement to be admissible under Rule 801(d)(2)(E).  Bourjaily, 483 U.S. at 176; United States v. Crespo de Llano, 838 F.2d 1006, 1017 (9th Cir. 1987).  Whether the government has met its burden is to be determined by the trial judge, not the jury.  United States v. Zavala-Serra, 853 F.2d 1512, 1514 (9th Cir. 1988).

The foundation for the admission of a co-conspirator statement may be established before or after the admission of the statement. If a proper foundation has not yet been laid, the court may nevertheless admit the statement, but with an admonition that the testimony will be stricken should the conspiracy not be proved. United States v. Arbelaez, 719 F.2d 1453, 1469 (9th Cir. 1983); United States v. Kenny, 645 F.2d 1323, 1333-1334 (9th Cir. 1981).

It is not necessary that the defendant was present at the time the statement was made.  Sendejas v. United States, 428 F.2d 1040, 1045 (9th Cir. 1970).  Once the existence of the conspiracy is established, only "slight evidence" is needed to connect the defendant and declarant to it.  Crespo De Llano, 838 F.2d at 1017. The declaration itself, together with independent evidence, may constitute sufficient proof of the existence of the conspiracy and

the involvement of the defendant and declarant in it.  Bourjaily, 483
U.S. at 181.

The term "in furtherance of the conspiracy" is construed broadly
to include statements made to "induce enlistment or further
participation in the group's activities," to "prompt further action
on the part of conspirators," to "reassure members of a conspiracy's
continued existence," to "allay a coconspirator's fears," and to
"keep coconspirators abreast of an ongoing conspiracy's activities."
United States v. Yarborough, 852 F.2d 1522, 1535-1536 (9th Cir. 1988)
(citing cases).  Statements made with the intent of furthering the
conspiracy are admissible whether or not they actually result in any
benefit to the conspiracy.  United States v. Williams, 989 F.2d 1061,
1068 (9th Cir. 1993).  In addition, "[i]n determining whether a
statement is made 'in furtherance of' a conspiracy, the court looks to
the declarant's intent in making the statement, not the actual effect
of the statement."  Williams, 989 F.2d at 1068.

Courts have found statements "in furtherance of the conspiracy"
to include: (a) statements made to induce enlistment in the
conspiracy (United States v. Arias-Villanueva, 998 F.2d 1491, 1502
(9th Cir. 1993)); (b) statements made to keep a conspirator abreast
of a co-conspirator's activity, or to induce continued participation
in a conspiracy, or to allay the fears of a co-conspirator (Arias-
Villanueva, 998 F.2d at 1502); (c) statements made to prompt action
in furtherance of the conspiracy by either of the participants to the
conversation (United States v. Layton, 720 F.2d 548, 556 (9th Cir.
1983)); (d) statements related to the concealment of the criminal
enterprise (Tille, 729 F.2d at 620); (e) statement identifying
another co-conspirator as source for the drugs to be sold to

19

purchaser (<u>United States v. Lechuga</u>, 888 F.2d 1472, 1480 (5th Cir. 1989)); (f) "puffing," boasts, and other conversation designed to obtain the confidence of another conspirator (or apparent conspirator who actually was an undercover agent) (<u>United States v. Santiago</u>, 837 F.2d 1545, 1549 (11th Cir. 1988) ("bragging" and boasts by co-conspirator admissible in defendant's trial as statements in furtherance of conspiracy); <u>United States v. Miller</u>, 664 F.2d 94, 98 (5th Cir. 1981) ("[p]uffing, boasts, and other conversations . . . are admissible when used by the declarant to obtain the confidence of one involved in the conspiracy.")); (g) statements recounting the co-conspirator's past criminal activities (<u>United States v. Esacove</u>, 943 F.2d 3, 5 (5th Cir. 1991); (<u>United States v. McLernon</u>, 746 F.2d 1098, 1105-06 (6th Cir. 1984) (holding that there is no requirement that co-conspirator have personal knowledge of his statements and admitting co-conspirator's statements that he had been in the cocaine business for 20 years and worked with other defendants as in furtherance of conspiracy)), and (h) statements made to reassure members of the conspiracy's continued existence (<u>United States v. Yarbrough</u>, 852 F.2d 1522, 1535 (9th Cir. 1988)).

### 3.   Time Period of Conspiracy

Time is not a material element of a conspiracy. <u>United States v. Harrison-Philpot</u>, 978 F.2d 1520, 1526 (9th Cir. 1992). So long as the indictment places illegal activity within a reasonably identifiable time frame, it alleges dates with sufficient specificity. <u>United States v. Brown</u>, 720 F.2d 1059, 1076 (9th Cir. 1983) (indictment alleging that "transaction occurred during the first part of 1976" not defective); <u>United States v. McCown</u>, 711 F.2d 1441, 1450 (9th Cir. 1983) (holding the indictment alleging that

conspiracy began "on or about" and ended "on or about" certain date sufficiently informed defendants of the charges); United States v. Rohrer, 708 F.2d 429, 435 (9th Cir. 1983) (approving indictment alleging that conspiracy "extended until 'at least' 1980").  Here, there is no doubt that defendant was given "adequate notice of the charges against [him]."  United States v. Laykin, 886 F.2d 1534, 1543 (9th Cir. 1989).  Not only from the indictment, and from the discovery, but also from the earliest pleadings in this case, the government has indicated that it intended to prove defendant's involvement in the drug trafficking conspiracy beginning in October 2022.

**B.   Lay Opinions of Law Enforcement Witnesses**

The government may seek to introduce lay opinions from law enforcement witnesses, in particular the case agent, HSI Special Agent Collin Murphy.  Lay opinion testimony is admissible if it is (1) "rationally based on the perception of the witness," (2) "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue[,]" and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701; see also United States v. Freeman, 498 F.3d 893, 904-05 (9th Cir. 2007) (upholding, as proper lay testimony, detective's testimony interpreting ambiguous statements where his "understanding of ambiguous phrases was based on his direct perception of several hours of intercepted conversations . . . and other facts he learned during the investigation" and his testimony "proved helpful to the jury in determining what [defendants] were communicating during the recorded telephone calls").

An experienced government agent may testify as to his opinions and impressions of what he or she observed.  As the Ninth Circuit observed in United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982), in many cases the jury cannot "reach an intelligent conclusion" unless certain facts are presented "with the force and clearness as they appeared to the witness" by allowing the witness to "state his impressions and opinions based upon what he observed." Ultimately, opinion testimony by non-experts is "a means of conveying to the jury what the witness has seen or heard."  Id.; see also United States v. Gadson, 763 F.3d 1189, 1209 (9th Cir. 2014) ("[A]n investigator who has accumulated months or even years of experience with the events, places, and individuals involved in an investigation necessarily draws on that knowledge when testifying; indeed, it is those out-of-court experiences that make the witness's testimony helpful to the jury.").

An experienced government agent may provide opinion testimony even if that opinion is based in part on information from other agents familiar with the issue.  United States v. Andressan, 813 F.2d 1450, 1458 (9th Cir. 1987); United States v. Golden, 532 F.2d 1244, 1248 (9th Cir. 1976).

**C.   Authentication**

The government does not anticipate that the parties will file any stipulations regarding the authenticity of the government's exhibits, and therefore has set forth the below background principles regarding authenticity.

### 1.   Authentication - Generally

The foundational "requirement of authentication or identification as a condition precedent to admissibility is satisfied

22

by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a).  See also United States v. Dhinsa, 243 F.3d 635, 658-59 (2d Cir. 2001) (noting Rule 901 "does not erect a particularly high hurdle," and that hurdle may be cleared by "circumstantial evidence") (quoting United States v. Ortiz, 966 F.2d 707, 716 (1st Cir. 1992), cert. denied, 506 U.S. 1063 (1993)).  Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991), cert. denied, 511 U.S. 1035 (1994); see also Lexington Ins. Co. v. Western Pennsylvania Hosp., 423 F.3d 318, 328-29 (3d Cir. 2005) ("Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court.  The only requirement is that there has been substantial evidence from which they could infer that the document was authentic.").

Once the threshold showing has been met to admit the document, any questions concerning the genuineness of the item normally go to the weight of the evidence.  Orr v. Bank of America, 285 F.3d 764, 773 n.6 (9th Cir. 2002) ("Once the trial judge determines that there is prima facie evidence of genuineness, the evidence is admitted, and the trier of fact makes its own determination of the evidence's authenticity and weight."); United States v. Paulino, 13 F.3d 20, 23 (1st Cir. 1994) ("In respect to matters of authentication, the trial court serves a gatekeeping function.  If the court discerns enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be, then Rule 901(a) is

satisfied and the weight to be given to the evidence is left to the jury").

### 2.   Authentication - Distinctive Characteristics

Under Federal Rule of Evidence 901(b)(4), authentication may be made by distinctive characteristics, which may include "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."  Courts have relied upon this rule in admitting e-mail and chat communications and similar electronic evidence bearing distinctive characteristics.  For example, this may include the e-mail addresses used in the communications, the context and circumstances, and other surrounding circumstances.  See, e.g., United States v. Siddiqui, 235 F.3d 1318, 1322 (11th Cir. 2000) (in fraud, false statements, and obstruction case, e-mail authenticated by contents and context, including e-mail address, automatic reply to sender, the messages indicated knowledge of matter, and use of nicknames; and foreign deposition testimony concerning phone conversations after e-mail messages were transmitted, applying Rule 901(b)(4)), cert. denied, 533 U.S. 940 (2001); United States v. Safavian, 435 F.Supp.2d 36, 40 (D.D.C. 2006) (e-mails between defendant government official and lobbyist were authenticated by distinctive characteristics under Rule 901(b)(4) including the e-mail addresses used which bore the sender's and recipient's names; "the name of the sender or recipient in the bodies of the e-mail, in the signature blocks at the end of the e-mail, in the 'To:' and 'From:' headings, and by signature of the sender"; and the contents).

1                 3.   <u>Authentication - By Comparison</u>

2      Under Federal Rule of Evidence 901(b)(3), authentication may be

3 made "by either the trier of fact or an expert."  Under this rule,

4 the jury, as the trier of fact, may compare authenticated specimens

5 with the evidence sought for admission.  Courts have used this rule

6 to authenticate e-mails and electronic evidence.  <u>See</u>, <u>e.g.</u>, <u>United</u>

7 <u>States v. Safavian</u>, 435 F.Supp.2d 36, 40-41 (D.D.C. 2006) (e-mails

8 between defendant government official and lobbyist were authenticated

9 by comparing e-mail addresses, the use of the defendant's name and

10 business).

11                 4.   <u>Video and Audio Recordings</u>

12      A recording is admissible upon a showing that it is "accurate,

13 authentic, and generally trustworthy."  <u>United States v. King</u>, 587

14 F.2d 956, 961 (9th Cir. 1978).  The foundation that must be laid for

15 the introduction into evidence of such recordings is a matter largely

16 within the discretion of the court.  There is no rigid set of

17 foundational requirements.

18      [Recordings] are sufficiently authenticated under Fed. R. Evid.

19      901(a) if "sufficient proof has been introduced so that a

20      reasonable juror could find in favor of authenticity or

21      identification."  [Citing cases.]  This is done by proving a

22      connection between the evidence and the party against whom the

23      evidence is admitted, and can be done by both direct and

24      circumstantial evidence.

25 <u>United States v. Matta-Ballesteros</u>, 71 F.3d 754, 768 (9th Cir. 1995),

26 modified, 98 F.3d 1100 (9th Cir. 1996).  Indeed, Federal Rule of

27 Evidence 901 requires only that the United States make "a prima facie

28 showing of authenticity so that a reasonable juror could find in

favor of authenticity or identification," and the "probative force of the evidence offered is, ultimately, an issue for the jury."  United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989); see also Fed. R. Evid. 901(b)(4) (identifying evidence that satisfies the authentication requirement to include "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances").

A person who participated in, or monitored, a conversation is entitled to testify as to the contents of the conversation, notwithstanding the fact that the conversation was recorded.  See United States v. Gonzales-Benitez, 537 F.2d 1051, 1053-54 (9th Cir. 1976).  Additionally, a witness's testimony in this regard may be based upon the witness having heard the voice on another occasion under circumstances connecting it with the alleged speaker.  Fed. R. Evid. 901(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice recognition constitutes sufficient authentication.").

Recorded conversations are competent evidence even when they are partly inaudible, unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy. United States v. Tisor, 96 F.3d 370, 376 (9th Cir. 1996).  Here, for each recording,[3] at least one witness has reviewed and authenticated the video.

---

[3] The government's recordings in this case consist primarily of recordings of voicemails from defendant's phone, and recordings of certain statements made by defendant during his post-arrest interview.

1

### 5. Chain of Custody

The test of admissibility of physical objects connected with the commission of a crime requires a showing that the object is in substantially the same condition as when the crime was committed (or the object seized). Factors to be considered are the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with it. There is, however, a presumption of regularity in the handling of exhibits by public officials. United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991); United States v. Kaiser, 660 F.2d 724, 733 (9th Cir. 1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc); United States v. Jefferson, 714 F.2d 689, 696 (7th Cir. 1983). To the extent that alleged or actual gaps in the chain of custody exist, such gaps go to the weight of the evidence rather than to its admissibility. Harrington, 923 F.2d at 1374.

The government is not required to establish all links in the chain of custody or call all persons who may have come into contact with the piece of evidence. Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960). Gaps or defects in chain of custody go to the weight of the evidence rather than its admissibility. United States v. Matta-Ballesteros, 71 F.3d 754, 769-70 (9th Cir. 1995); United States v. Robinson, 967 F.2d 287, 292 (9th Cir. 1992). If the trial judge finds that there is a reasonable possibility that the piece of evidence has not changed in a material way, the court has discretion to admit the evidence. Kaiser, 660 F.2d at 733.

1

     **D.**   **Summary Exhibits**

2         To streamline the presentation of evidence for the jury, the

3 government intends to use multiple charts to summarize, <u>inter alia</u>,

4 (i) defendant's and D.J.'s drug shipments; (ii) details related to

5 the February 28, 2023 methamphetamine shipment; (iii) communications

6 related to the February 28, 2023 methamphetamine shipment; and (iv)

7 email communications between "Gary Mopson" and shipping companies

8 regarding the February 2023 shipments.

9         Charts and summaries of evidence are governed by Federal Rule of

10 Evidence 1006, which permits the introduction of charts, summaries,

11 or calculations of voluminous writings, recordings, or photographs

12 which cannot conveniently be examined in court.  <u>See</u> Fed. R. Evid.

13 1006.  Accordingly, a summary chart may be admitted as substantive

14 evidence when the proponent establishes that the underlying documents

15 upon which the summary is based are voluminous, admissible, and

16 available for inspection.  <u>Id</u>; <u>see also</u> <u>United States v. Meyers</u>, 847

17 F.2d 1408, 1412 (9th Cir. 1988).  All that is required for the rule

18 to apply is that the underlying writings be voluminous, and that in-

19 court examination not be convenient.  <u>United States v. Scales</u>, 594

20 F.2d 558, 562 (6th Cir. 1979) (admitting charts summarizing charges

21 in indictment and overt acts evidencing conspiracy charge).  Although

22 the materials underlying the summary must be "admissible," they need

23 not themselves be "admitted" into evidence.  <u>Meyers</u>, 847 F.2d at

24 1412.

25        In addition, the summary chart must be accurate, authentic, and

26 properly introduced.  <u>Scales</u>, 594 F.2d at 563.  Where a chart does

27 not contain complicated calculations that would require an expert for

28 accuracy, authentication of the chart requires only that the witness

(1) have properly catalogued the exhibits and records upon which the chart is based and (2) have knowledge of the analysis of the records referred to in the chart. Id. Neither of these requirements necessitates any special expertise. Id. The person who supervises the compilation of the summary chart is the proper person to attest to its authenticity and accuracy. Id. In addition, summary charts may be used by the government in its opening statement. See United States v. De Peri, 778 F.2d 963, 979 (3d Cir. 1985) (approving government's use of chart); United States v. Rubino, 431 F.2d 284, 289-90 (6th Cir. 1970) (same).

Also, apart from Rule 1006, a summary of evidence may be presented to the jury with proper limiting instructions. Rule 611(a) recognizes that the trial court must "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; [and] (2) avoid wasting time . . . ." Fed. R. Evid. 611(a); see also United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980) (in tax case, use of chart summarizing defendant's assets, liabilities, and expenditures "contributed to the clarity of the presentation to the jury, avoided needless consumption of time and was a reasonable method of presenting the evidence").

### E. Physical Evidence – Sample of Methamphetamine

In this case, the government intends to introduce as evidence one of the vacuum-sealed bags containing methamphetamine seized from the March 5 Drug Shipment. To be admitted, real evidence (i.e., a physical exhibit) must be in substantially the same condition as when the crime was committed. The court may admit the evidence if there is "a reasonable probability the article has not been changed in

1   important respects." United States v. Harrington, 923 F.2d 1371,

2   1374 (9th Cir. 1991).

3       The government will establish the chain of custody of its

4   physical evidence.  In establishing chain of custody, the government

5   is not required to call all persons who may have come into contact

6   with the piece of evidence.  Reyes v. United States, 383 F.2d 734

7   (9th Cir. 1967).  Alleged defects in the chain of custody go to the

8   weight of the evidence rather than to its admissibility. United

9   States v. Matta-Ballesteros, 71 F.3d 754, 769 (9th Cir. 1995),

10  amended on denial of reh'g and reh'g en banc, 98 F.3d 1100 (9th Cir.

11  1996).  In the absence of evidence of tampering, there is a

12  presumption that public officers have properly discharged their

13  official duties.  Harrington, 923 F.2d at 1374.

14      **F.   Business Records**

15      The government will seek to offer certain business records in

16  this case, including, among others, (i) subscriber records from

17  Charter Communications; (ii) subscriber records from T-Mobile.  (iii)

18  account holder records from DHL, (iv) invoice and shipping label

19  records from Preferred Shipping and DHL; and (v) web log information

20  for IP address activity from Preferred Shipping.  A document is

21  admissible as a business record if two foundational facts are

22  established: (a) the document was made or transmitted by a person

23  with knowledge at or near the time of the incident recorded, and

24  (b) the document was kept in the course of a regularly conducted

25  business activity.  See Fed. R. Evid. 803(6); United States v. Ray,

26  930 F.2d 1368, 1370 (9th Cir. 1990); Kennedy v. Los Angeles Police

27  Dep't, 901 F.2d 702, 717 (9th Cir. 1990).

28

In determining if these foundational facts have been established, the Court may consider hearsay and other evidence not admissible at trial, including business records declarations.  See Fed. R. Evid. 104(a) and 1101(d)(1); Bourjaily, 483 U.S. at 178-179.  The foundation for business records may be established either through a custodian of records or "other qualified witness."  The phrase "other qualified witness" is broadly interpreted to require only that the witness understand the record keeping system.  See Ray, 930 F.2d at 1370.  "There is no requirement that the government establish when and by whom the documents were prepared."  Id.; United States v. Huber, 772 F.2d 585, 591 (9th Cir. 1985) ("[T]here is no requirement that the government show precisely when the [record] was compiled.").

Records of regularly conducted activity that would be admissible under Rule 803(6) do not require extrinsic evidence of authenticity as a condition precedent to admissibility, if they are accompanied by a written declaration of a custodian of record certifying that the record: (1) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (2) was kept in the course of the regularly conducted activity; and (3) was made by the regularly conducted activity as a regular practice.  Fed. R. Evid. 902(11).

Here, in letters dated February 13, 2024 and February 14, 2024, the government has provided the requisite notice and certification to satisfy Rule 902(11) and Rule 803(6) for business records currently in its possession that it may seek to admit.  Specifically, the government has given notice to defendant that it intends to offer business records pursuant to Rule 902(11) and 803(6) from such entities as Google, T-Mobile, and Charter Communications.

1

### G. Photographs

The government intends to introduce various photographs including, among others, photographs of the March 5 Drug Shipment, and photographs taken of content from defendant's phone.  Such photographs are generally admissible as evidence.  See, e.g., United States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977) (photographs of crime scene admissible).  Indeed, photographs should be admitted so long as they fairly and accurately represent the event or object in question.  United States v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978).  Also, "[p]hotographs are admissible as substantive as well as illustrative evidence."  United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).  Photographs may be authenticated by a witness who "identif[ies] the scene itself [in the photograph] and its coordinates in time and place."  See Lucero v. Stewart, 892 F.2d 52, 55 (9th Cir. 1989) (internal quotation marks omitted).

### H. Expert Opinion Testimony

A qualified expert witness may provide opinion testimony on a fact at issue if specialized knowledge will assist the trier of fact.  Fed. R. Evid. 702.  The Court has broad discretion to determine whether to admit expert testimony.  United States v. Anderson, 813 F.2d 1450, 1458 (9th Cir. 1987) (affirming district court decision to admit expert's testimony based on personal participation in over 50 drug sales).  Expert opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field.  Fed. R. Evid. 703.

The government provided defendant notice of, and summarized the expected testimony from, two witnesses that it intends to call as experts at trial:  CBP Chemist Rachel Wheale and DEA Special Agent

Steve Paris.  Both are qualified to testify and provide expert opinions.  First, Ms. Wheale's testimony will assist the jury in understanding the testing of the methamphetamine seized from the March 5 Drug Shipment.  Second, Agent Paris's testimony will assist the jury in understanding, among other topics, the difference between personal use and distribution quantities of cocaine and methamphetamine; how drug trafficking organizations transport large shipments of narcotics; how drug trafficking organizations communicate internally, including the use of encrypted messaging applications; the price of methamphetamine and cocaine in March of 2023 in the United States versus in New Zealand and Australia; and the meaning of text messages found on defendant's phone.

After each expert describes their qualifications, principles, and methodologies, the government will request that the Court make an express reliability finding on the record, which can be done at sidebar or on a break before each expert offers their expert opinions.  The government makes this request pursuant the decision in United States v. Holguin, 51 F.4th 841 (9th Cir. 2022), in which the Ninth Circuit held that "district courts must make explicit findings that the government's expert testimony was reliable."  Id. at 851.  As the Court explained, "[a] district court abdicates its gatekeeping role, and necessarily abuses its discretion, when it makes no reliability findings.  Reliability findings must be made explicit on the record -- an implicit finding does not suffice.  This requirement ensures that district courts engage in the reliability inquiry and create a record of that inquiry to facilitate appellate review."  Id. at 851 (cleaned up).

1    **I.   Scope of Cross-Examination of Defendant**

2         If defendant testifies at trial, he waives his right against

3    self-incrimination, and the government will cross-examine him on all

4    matters reasonably related to the subject matter of his testimony.

5    See, e.g., Fitzpatrick v. United States, 178 U.S. 304 (1971) ("The

6    defendant cannot assert a self-incrimination privilege 'on matters

7    reasonably related to the subject matter of his cross-

8    examination.'"); United States v. Black, 767 F.2d 1334, 1341 ("What

9    the defendant actually discusses on direct does not determine the

10   extent of permissible cross-examination or his waiver.  Rather, the

11   inquiry is whether 'the government's questions are reasonably

12   related' to the subjects covered by the defendant's testimony.")

13   (internal quotations and citation omitted).  The scope of cross-

14   examination is within the discretion of the trial court.  Fed. R.

15   Evid. 611(b).  Defendant has no right to avoid cross-examination on

16   matters that call into question his claim of innocence.  United

17   States v. Mehrmanesh, 682 F.2d 1303, 1310 (9th Cir. 1982); United

18   States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).

19        Defendants' credibility will be crucial if he chooses to

20   testify.  Rule 404(b) does not proscribe the use of other act

21   evidence as an impeachment tool during cross-examination.  United

22   States v. Gay, 967 F.2d 322, 328 (9th Cir. 1992).  Moreover, the

23   prejudicial effect of such evidence, if any, is limited in this case

24   because defendant has waived jury trial.  See, e.g., United States v.

25   Ziska, 267 F. App'x 717, 719 (9th Cir. 2008); E.E.O.C. v. Farmer

26   Bros. Co., 31 F.3d 891, 898 (9th Cir. 1994).

27

28

**J.    Admission of Defendant's Statements During First Trial**

Defendant represented himself during the previous trial in this case and made numerous false, inculpatory, and/or contradictory statements during his opening statement and closing argument. Defendant's admissions were factual in nature and relate directly to the crimes at issue in this case.  Consistent with the Federal Rules of Evidence, the government may seek to introduce portions of defendant's prior opening statement and closing argument as party-opponent admissions.

A defendant's statement, when offered by the government against that defendant at trial, is an admission by a party-opponent under Federal Rule of Evidence 801(d)(2)(A).  United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).  Even if offered for the truth of the matter asserted in the statement, the statement is not hearsay, Fed. R. Evid. 801(c)-(d), and would not be subject to the general exclusion of hearsay statements, Fed. R. Evid. 802. As numerous courts have recognized, statements made by a pro se defendant during his opening statement and closing argument in a previous trial qualify as party-opponent admissions under Federal Rule of Evidence 801(d)(2)(A).  See United States v. Michael McElhiney, 85 F. App'x 112, 115 (10th Cir. 2003), **2-3 (10th Cir. 2003) (holding that defendant's incriminating statements during closing argument while representing himself in prior trial were admissible in subsequent trial as nonhearsay admissions by party, where statements were factual in nature, and related directly to crimes at issue in case); United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1121 (D.N.M. 2012) ("[A] party may use an opponent's closing statements from a prior proceeding as an admission by party opponent[.]");see also

35

1   United States v. Baca, 409 F. Supp. 3d 1041 (D.N.M. 2019); United

2   States v. Helbrans, No. S219CR497NSR0102, 2021 WL 4778525, at *23

3   (S.D.N.Y. Oct. 12, 2021); United States v. Bakshinian, 65 F. Supp. 2d

4   1104 (C.D. Cal. 1999); United States v. Shrader, No. CR.A. 1:09-CR-

5   00270, 2010 WL 2671497, at *5 (S.D.W. Va. July 1, 2010); United

6   States v. Villa-Guillen, No. CR 16-526 (FAB), 2020 WL 1536599, at *11

7   (D.P.R. Mar. 28, 2020).

8        The Court should allow the government to introduce the various

9   relevant statements defendant made throughout his opening statement

10  and closing argument as party-opponent admissions under Federal Rule

11  of Evidence 801(d)(2)(A).[4]  Defendant's repeated factual assertions

12  related to his business operation and other topics relevant to this

13  case, which fall squarely within the category of admissible party-

14  opponent admissions.  Federal Rule of Evidence 801(d)(2)(A);

15  McElhiney, 85 F. App'x at 115 (10th Cir. 2003). For example, during

16  his opening statement, defendant claimed to own and operate a

17  warehouse company in Los Angeles.  Then, as part of his closing

18  argument, defendant stated that his purported company arranged two

19  prior shipments to New Zealand, both of which relate to the charged

20  drug-shipping conspiracy that is at the heart of this case.[5]  These

21

22       [4] These statements may include, but are not limited to,
    defendant's statements that (i) "I've been in business for about 18

23  years, and I've run a sizable warehousing company that ships products
    worldwide," (ii) "[t]he October shipment got there uninterrupted.  It

24  was shipped in my name.  It was shipped by an employee," (iii) "[a]t
    that point in time I did not know what he had shipped, but I knew

25  that we did not have any customers in New Zealand," and (iv) "Jackson
    Mensah Holdings had previous shipments to New Zealand that went

26  uninterrupted.  That meant that the account was in good standing."

27       [5] The government has ordered, but not yet received, the relevant
    portions of the transcripts from the previous trial.  Upon receipt,

28  the government can identify the specific statements it may seek to
    admit.  The government thus reserves the right to seek admission of
    *(footnote cont'd on next page)*

factual assertions, and others like them, are not only incriminating in that they support that defendant was  knowledge directly involved with the criminal activity charged in this case (_i.e._, packaging and sending shipments of methamphetamine to New Zealand), but also because they often contradict one another and thus belie defendant's theory of defense.  The government may seek to introduce defendant's admissions during the upcoming trial as evidence of his involvement in the charged conspiracy and attempted exportation.  Because defendant's inculpatory statements were factual in nature, and would be offered against him by the government, the Court should admit them as party-opponent admissions under Federal Rule of Evidence 801(d)(2)(A).

### K.   Cross-Examination of Defense Character Witnesses

If defendant calls a character witness, the government should be allowed to cross examine that witness with information pertaining to how the witness's opinion of defendant's character would change if the witness were confronted with a specific instance of defendant's conduct that rebuts that opinion.  A character witness who offers an opinion about or discusses defendant's reputation for good character on direct examination can be cross examined with relevant specific instances of conduct.  Under Federal Rule of Evidence 404(a)(2)(A), character evidence is admissible when offered by the prosecution to rebut "evidence of a pertinent trait" of character offered by a defendant.  See also Fed. R. Evid. 405(a).  "[W]hen the defendant 'opens the door' to testimony about an issue by raising it for the first time himself, he cannot complain about subsequent government

additional prior statements as admissible party-opponent admissions after it receives the trial transcripts.

1  inquiry into that issue." <u>United States v. Mendoza-Prado</u>, 314 F.3d
2  1099, 1105 (9th Cir. 2002) (quoting <u>United States v. Hegwood</u>, 977
3  F.2d 492, 496 (9th Cir. 1992)).  Such cross examination can be
4  properly phrased in the form of "have you heard" or "did you know"
5  questions regarding defendant's criminal conduct.  <u>See</u> <u>United States</u>
6  <u>v. Scholl</u>, 166 F.3d 964, 974 (9th Cir. 1999).

7      **L.   Reciprocal Discovery and Affirmative Defenses**

8      The government has requested reciprocal discovery, Jencks Act
9  material, and expert disclosures.  To date, defendant has produced to
10 the government approximately thirty-six pages of correspondence
11 documents and cannabis transportation manifests.  Defendant has not
12 provided the government with notice of any affirmative defenses.  To
13 the extent defendant seeks to introduce or use any evidence that he
14 was obligated to, but did not produce in reciprocal discovery, the
15 government reserves the right to object and seek to have such
16 evidence precluded.

17     **M.   Agent at Counsel Table**

18     The government intends to have Special Agent Murphy present at
19 counsel table during trial.  Under Rule 615, investigative agents are
20 permitted to sit at counsel table throughout the trial even though
21 the "agent is or may be a witness" because his or her "presence may
22 be extremely important to government counsel, especially when the
23 case is complex or involves some specialized subject matter."  Fed.
24 R. Evid. 615, Notes of Committee on the Judiciary, Senate Rpt. No.
25 93-1277.

26                        *   *   *   *   *

27     Pursuant to the Court's Criminal Standing Order, the parties met
28 and conferred on April 25. 2023 regarding the government's overview

of anticipated legal and evidentiary issues.  Based on that meet and confer, and the parties' prior meet and confer, the government understands that it is defendant's position that Special Agent Murphy does not have the requisite knowledge to give lay opinion testimony. The government further understands that defendant objects to the introduction of statements from his prior trial as violative of his right to represent himself at trial, and an improper use of what defendant characterizes as argument from trial.

## VI.   CONCLUSION

The government respectfully reserves the right to supplement or modify this Trial Memorandum as may be appropriate.

Dated: April 26, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


/s/ Declan T. Conroy
DECLAN T. CONROY
CAMERON C. VANDERWALL
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA